NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-83                                        Appeals Court

INTERNATIONAL LONGSHOREMEN ASSOCIATION, LOCAL 1413-1465  vs.
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]


No. 23-P-83.

Bristol.     October 6, 2023. – April 3, 2024.

Present:  Green, C.J., Milkey, & Grant, JJ.


Anti-Discrimination Law, Sex.  Employment, Discrimination.
    Massachusetts Commission Against Discrimination.  Labor,
    Fair representation by union.  Administrative Law,
    Substantial evidence.  Damages, Under anti-discrimination
    law, Emotional distress.  Emotional Distress.  Labor,
    Federal preemption.  Jurisdiction, Federal preemption.
    Federal Preemption.  Practice, Civil, Judgment on the
    pleadings, Waiver.  Waiver.




    Civil action commenced in the Superior Court Department on
July 22, 2020.

    The case was heard by Renee P. Dupuis, J., on motions for
judgment on the pleadings.


    Scott W. Lang for the plaintiff.
    Peter M. Mimmo for Massachusetts Commission Against
Discrimination.
    The following submitted briefs for amici curiae:

---

[1] April L. Robar.

Andrea Joy Campbell, Attorney General, & Jessica Rahmoune & Douglas S. Martland, Assistant Attorneys General, for the Commonwealth.
James A.W. Shaw & Ryan M. Quinn for Massachusetts AFL-CIO.
Joseph L. Sulman for Massachusetts Employment Lawyers Association.

MILKEY, J.  Women have been employed at the Port of New Bedford for years.  However, their work there traditionally was confined to certain jobs that were viewed as low-level.  Over time, some women began to seek other positions at the port, including that of forklift operator, a position that traditionally had been staffed only by men.  Such efforts were rebuffed by the International Longshoremen Association, Local 1413-1465 (union), which ran the hiring process through which workers were selected for available positions.  In 2009, April Robar filed a complaint with the Massachusetts Commission Against Discrimination (commission) alleging that the union had engaged in sex discrimination against her.

Specifically, Robar alleged that she was passed over for work as a forklift operator in favor of men who not only were less qualified than she was, but who -- unlike her -- lacked a mandatory qualification for the position.  When given the opportunity to respond, the union's then-treasurer (later president and business agent), Edmond Lacombe, supplied a written statement that proved unhelpful to the union's defense.  Specifically, among other things, he recounted that the women

who were hired for the traditionally female positions "did not complain"; rather, "[t]hey, more or less, knew their place when work was issued and accepted the outcome."

Following an adjudicatory hearing, a hearing officer found that the union had discriminated against Robar based on her sex. The full commission upheld the hearing officer's decision, as did a Superior Court judge. In this further appeal, the union challenges the commission's decision on the merits and additionally argues that it is preempted by various Federal labor laws.[2] We affirm.

Background.[3] The freight terminal in New Bedford Harbor is operated by Maritime International, Inc. (Maritime). Maritime and the union entered into a collective bargaining agreement (CBA) under which the union was given the role of referring interested workers for available work. Strictly speaking, Maritime retained final hiring rights, but, as a practical matter, it was the union that selected who would be hired among the union members and nonunion workers who would show up at the docks each morning to fill open positions. This process is a

---

[2] We acknowledge the amicus letter submitted by the Commonwealth and the amicus briefs submitted by the Massachusetts AFL-CIO and the Massachusetts Employment Lawyers Association.

[3] Our recitation of the facts is based on the findings made by the hearing examiner.

form of what is known as a "hiring hall," and specifically is known as a "shape up" in the maritime industry. At the shape ups, union members were selected first based on the order of their seniority in the union, and according to the testimony of union members, only then would nonunion workers be hired for the remaining jobs. As of 2009, there were no female members of the union.

The CBA included some specific requirements for different dock positions. For example, consistent with regulations issued by the Occupational Safety and Health Administration (OSHA), see 29 C.F.R. § 1910.178(l), all forklift operators were required to have a forklift safety certificate issued by Maritime.

In 2004, Robar started working at the Maritime terminal as a nonunion "wrapper/stamper" on fish boats. That job involved wrapping pallets of fish in plastic sheeting and stamping boxes of fish. It was viewed as an undesirable position that typically was staffed only by women. The union selected men for such positions only if there were not enough women to fill the positions.

Over time, the types of boats serviced at the terminal shifted. The number of fish boats decreased, leaving available work mostly confined to fruit boats, which did not need wrapper/stampers. Robar and other workers testified that they

had never seen any women hired for off-loading the fruit boats. There was no evidence to the contrary.

Because there were fewer available jobs on fish boats, and in order to seek better working conditions, Robar sought work at the terminal as a forklift operator. She already had received an OSHA-mandated forklift safety certificate from a previous employer, and she obtained one from Maritime as well.[4] In her spare time, she also availed herself of the opportunity to undergo informal practical training to learn how to operate forklifts on the docks. There was testimony from a union member that Robar did an "outstanding job" in operating a forklift on the docks.

Despite Robar's qualifications and efforts to obtain work as a forklift operator, she was denied the position five separate times by the union officials running the shape up,

---

[4] In the wake of security concerns raised by the attacks of September 11, 2001, dock workers also were required to obtain a "transportation worker identification credential" (known as a TWIC card). In fact, Robar went through proper procedures and obtained a TWIC card. The union points out that given problems that many dock workers faced in obtaining TWIC cards, the requirement that they hold one was softened so as to allow non-cardholders to continue working without one so long as the ratio of TWIC cardholders to non-cardholders was at least 1:5. Thus, although Robar's being hired did not depend on her holding a TWIC card, her having one was, if anything, a net plus to the union. After all, the union had an express obligation under the CBA to "ensure that a sufficient number of employees hired possess a TWIC as required by the Department of Homeland Security."

including then-vice president (later president and business agent) Joseph Fortes.  On one of these occasions, Fortes chose two male nonunion workers instead of Robar despite the fact that they lacked the required safety certificate.  In response to Robar's anger at being passed over, she received a simple explanation:  "We don't pick ladies here working on the fruit boats."  The comment was made by a union member who was standing directly in front of Fortes at the time.  Fortes chastised the speaker for making the comment:  "No, no, no, don't say that. We don't do that, we don't say that here."  When Robar sought work for an available forklift position at another shape up, Fortes told her to go home to retrieve a copy of her forklift certification from her previous employment (even though she also had one from Maritime), and then he hired a man in her place as soon as she left to retrieve the unnecessary document.

On November 25, 2009, Robar lodged a complaint with the commission alleging, in pertinent part, sex discrimination by the union pursuant to G. L. c. 151B, § 4.[5]  Among the exhibits Robar submitted to the commission were documents related to a

---

[5] Robar also initially brought a race discrimination claim against the union, which was dismissed by the commission for lack of probable cause.  In addition, she brought a retaliation claim that she eventually abandoned.  Although she initially cited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in addition to State law, she no longer presses that as an independent source of authority.

sex discrimination proceeding that the National Labor Relations Board (NLRB) had initiated based on a request made by a female coworker.[6]  Robar also included evidence that shortly after the NLRB issued a complaint against the union, the union dramatically changed its membership requirements so as to make it much more difficult to join the union.  Specifically, prior to the change, one could join the union after having accumulated 300 total hours of dock experience.  Afterwards, not only were 400 hours of experience needed, but those hours had to have been incurred during the previous fiscal year.  Notwithstanding that change, the union subsequently admitted five men to the union who had not completed the requisite 400 hours of work during the previous year.

After two days of testimony, the hearing officer found that the union had discriminated against Robar during shape ups based on her sex.  The hearing officer pointed to indirect evidence of bias, such as the union's passing over Robar, despite her qualifications, in favor of men who lacked a mandatory safety certificate.  She also pointed to direct evidence of bias, such as the comment by then-union treasurer Lacombe about a time when

---

[6] The specific manner in which the NLRB complaint involving the coworker was resolved is not clear on the record before us. There is a suggestion in the record that the case settled and that the coworker "beat the case or whatever and they paid her money."

women "knew their place."  By way of relief, the hearing officer awarded Robar $50,000 for emotional distress and directed the union to confer union membership on Robar retroactive to October 1, 2009, including "whatever pension, death, and other benefits" would have accrued since then.  The union appealed the hearing officer's finding on discrimination, and in June 2020, the full commission upheld the hearing officer's decision.

In July 2020, the union filed a complaint for judicial review of the commission's decision in the Superior Court, and the commission filed a counterclaim seeking enforcement of that decision.  See G. L. c. 30A, § 14.  After the parties filed cross motions for judgment on the pleadings, a Superior Court judge ruled in the commission's favor on January 3, 2022.  Amended final judgments entered on July 13, 2022.[7]

Discussion.  1.  Merits.  On appeal, we review the commission's decision in accordance with G. L. c. 30A, § 14 (7) (c), giving deference to the hearing officer's role as fact finder.  See Smith College v. Massachusetts Comm'n Against

---

[7] The Superior Court judge initially issued a judgment that simply dismissed the union's complaint.  Pointing out that it had brought a counterclaim seeking enforcement of its order, the commission requested that two separate judgments be entered reflecting the awards specific to the commission and to Robar. The judge followed that requested course of action even though it is axiomatic that, barring the invocation of Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), there should never be more than one final judgment in a civil case.  See Pantazis v. Mack Trucks, Inc., 92 Mass. App. Ct. 477, 478 n.4 (2017).

Discrimination, 376 Mass. 221, 224 (1978). Many of the union's appellate arguments relate to the hearing officer's credibility determinations. The union maintains that the hearing officer erred both in crediting the commission's witnesses despite reasons to consider them biased, and in failing to credit the union's witnesses, who it claims were trustworthy. Such arguments warrant little discussion because credibility findings are for the hearing officer to make. See Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 676 (1993). In addition, we note that our review of the record reveals that the hearing officer displayed an even-handed approach, which undercuts the union's intimations of bias. For example, when the commission objected to examination by union counsel that sought to explore potential bias of one of the commission's witnesses, the hearing officer overruled that objection.

Nor is there any merit to the union's argument that the hearing officer's findings should be put aside on the ground that she misunderstood the working conditions and union hiring rules in the Port of New Bedford. As evidence of her lack of understanding, the union points to various requests that the hearing officer made for clarification. Far from evincing her ignorance of the issues, such requests demonstrate her conscientious efforts to make sure she understood them. In the end, the union lost not because the hearing officer

misunderstood the reasons why Robar was passed over for the available forklift positions, but because the hearing officer did not credit the union's explanation.[8]  There was ample support in the record for the hearing officer's findings and rulings, even apart from the direct suggestions of bias inherent in statements made by union members or officials.[9]  We discern no error in the hearing officer's application of the traditional three-stage test regarding how discrimination claims can be established.  See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000).  There was evidence credited by the hearing officer that Robar was qualified to be hired as a forklift operator and that the union treated her differently

---

[8] We acknowledge that, while requiring that all forklift operators have a forklift safety certificate, the CBA declares, in highlighted text, that "the forklift safety certificate is not a license and is not a measure of qualification to operate a forklift."  Thus, a forklift safety certificate is a necessary, but not a sufficient, test that someone is qualified to operate a forklift.  We do not view the hearing officer's decision as misunderstanding that point, or as dependent on viewing it as such.

[9] The union seeks to discount the import of the "[w]e don't pick ladies here [for] working on fruit boats" comment on the ground that it came from a mere union member, not a union official in charge of the shape up.  It also argues that Fortes, who was then union vice president, immediately objected to the comment when it was made.  In context, however, Fortes's reaction can be seen not as disavowing the substance of the comment but as chastising the speaker for saying it out loud.  In any event, we need not resolve whether there was adequate direct evidence of discrimination on its own, in light of the fact that the hearing officer adequately based her finding of prima facie discrimination on circumstantial evidence.

from men even when they lacked a mandatory qualification for the position, without any credible explanation for the disparate treatment. Nothing more is required. See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 444-445 (1995) ("once a plaintiff has established a prima facie case and further shows . . . that the employer's articulated reasons are a pretext . . ., the plaintiff is entitled to recovery for illegal discrimination under G. L. c. 151B").

In addition to arguing that the hearing officer's decision was not supported by substantial evidence, the union challenges the particular relief that she ordered, including the award for emotional distress damages, the civil penalty imposed on the union, and the order to grant Robar union membership, on the grounds that these damages were arbitrary, capricious, unsupported by the evidence, and not in accordance with the law.[10] We disagree.

"Emotional distress damage awards, when made, should be fair and reasonable, and proportionate to the distress

---

[10] The union also challenges the commission's award of $50,645.47 in legal fees, which amounted to ninety percent of the fees requested, as excessive. However, that claim is unsupported by legal argument demonstrating how the award is excessive. We therefore defer to the commission's expertise and uphold the award. Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993) (commission is in "best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services").

suffered."  Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549, 576, cert. denied sub nom. Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination, 543 U.S. 979 (2004).  To award such damages, the hearing officer must find that the complainant suffered emotional distress as a result of the respondent's unlawful act. Id.  In this case, the hearing officer found that Robar testified credibly and "with great persuasiveness" that she felt hurt, upset, and like a second-class citizen when the union did not hire her as a forklift operator.  Robar also testified that she continued to feel upset by the discrimination years afterward, stating that the union's refusal to give her a chance made her feel "unworthy and unqualified," led to her low self-esteem, and made her afraid to talk to her male supervisor at the dock.  As the finder of fact, the hearing officer was permitted to credit Robar's testimony and evaluate the level of emotional distress Robar suffered.  Therefore, the hearing officer's emotional distress award is proportionate to the injury Robar suffered and supported by substantial evidence.

In imposing the maximum civil penalty of $10,000, the hearing officer cited the "egregious nature" of the union's conduct, finding that the union engaged in "concerted activity" to deprive Robar of the benefits of union membership.  Given that the union increased its membership work requirement from

300 hours total to 400 hours in a single fiscal year shortly after the NLRB filed a discrimination complaint against it, yet subsequently granted membership to men who had not fulfilled that increased hour requirement, we conclude that the hearing officer's rationale for imposing the maximum penalty was also supported by substantial evidence.

We also discern no error in the hearing officer's order to grant Robar union membership.  While it is undisputed that Robar had accrued only 179.5 hours of work between 2004 and 2009, the hearing officer found that this was a direct result of the union's discriminatory treatment of Robar.[11]

2.  Preemption.  a.  Waiver.  The union now argues that the commission's claims against it are preempted by three different Federal labor laws:  § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185; the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.; and §§ 7 and 8 of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 157-158.  None of these arguments was raised to the

---

[11] The union's suggestion that the hearing officer's finding as to when Robar would have accumulated the hours necessary for union eligibility depended on subsequent work she performed at the Port of Providence, Rhode Island, is insufficient to demonstrate a lack of substantial evidence.  The hearing officer relied primarily on the fact that Robar was not chosen over similarly qualified individuals and that the union granted membership to five men who had not reached the new 400-hour requirement.

commission.  Nor did the union raise them to the Superior Court judge during its briefing of the merits or at the hearing on the cross motions for judgment on the pleadings.[12]  Accordingly, we must first decide whether the union waived its preemption arguments by not raising them in a timely manner, or whether such arguments instead go to subject matter jurisdiction and therefore can be raised at any time.  Compare Albert v. Municipal Court of Boston, 388 Mass. 491, 493 (1983) (arguments not raised to agency during adjudication are waived except in exceptional circumstances), with Commonwealth v. DeJesus, 440 Mass. 147, 151 (2003) (arguments based on subject matter jurisdiction can be raised at any point).

Whether a defense based on Federal preemption can be waived is itself a question of Federal law.  See International Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 388 (1986) (Davis) ("Pre-emption . . . is always a federal question").  Because the answer to that question ultimately turns on congressional intent, it may vary depending on the Federal statute at issue.  See id. at 391 n.9 (jurisdictional preemption applies to claims "that go to the State's actual adjudicatory or

---

[12] The union argued preemption by the LMRA and ERISA for the first time during the dispute over the form of the judgment, that is, after the judge already had denied the union's motion for judgment on the pleadings and allowed the commission's cross motion.  The union argued preemption under the NLRA for the first time in the appeal before us.

regulatory power as opposed to the State's substantive laws").
Case law establishes that arguments that State claims have been
preempted by the LMRA and ERISA are subject to waiver.  See,
e.g., Sweeney v. Westvaco Co., 926 F.2d 29, 38-41 (1st Cir.)
(Breyer, C.J.), cert. denied, 502 U.S. 899 (1991) (§ 301 of LMRA
is not jurisdictional and arguments based on it can be waived);
Ritter v. Massachusetts Cas. Ins. Co., 439 Mass. 214, 217 ("an
ERISA preemption claim is treated as a waivable affirmative
defense").  Because it is uncontested that the union did not
timely raise its LMRA and ERISA preemption defenses, those
defenses have been waived.[13]

A different result applies to the commission's argument
that the union waived its preemption defense under the NLRA, at
least to the extent such arguments are based on §§ 7 and 8 of
that statute.  This type of preemption -- which has become known

---

[13] Even if the union's LMRA preemption argument had not been
waived, we would agree with the commission's argument that the
CBA was not central to the hearing officer's finding of
discrimination.  See Lingle v. Norge Div. of Magic Chef, 486
U.S. 399 (1988) (State claim not preempted because resolution
not dependent on interpretation of collective bargaining
agreement, even if claim could have been brought under
agreement).  See also Ralph v. Lucent Techs., Inc., 135 F.3d
166, 171 (1st Cir. 1998), citing Livadas v. Bradshaw, 512 U.S.
107, 123-124 (1994) (no preemption under § 301 of LMRA because
"plaintiff's rights under state and federal statutes . . . exist
independently of the collective bargaining agreement and do not
require interpretation of that agreement").  We express no view
on the viability of the union's waived ERISA preemption
argument.

as Garmon preemption -- is based on the theory that Congress gave the NLRB exclusive jurisdiction over certain kinds of labor disputes.  See San Diego Bldg. Trades v. Garmon, 359 U.S. 236 (1959) (if claim before State or Federal court arises from "activity . . . arguably subject to § 7 or § 8 of the [NLRA] . . . courts must defer to the exclusive competence of the [NLRB]").  The Supreme Court has specifically held that Garmon preemption, if it applies, cannot be waived.  See Davis, 476 U.S. at 393.  We therefore turn to the union's argument that such preemption applies here.

b.  Preemption by the NLRA.  Garmon preemption is often portrayed as considerably broad, characterized as applying whenever conduct is "arguably subject to § 7 or § 8 of the [NLRA]."  Garmon, 359 U.S. at 245.  Nevertheless, case law long has recognized some exceptions to that sweep.  The Supreme Court itself has acknowledged that Garmon preemption does not preclude claims that are based on conduct that was "merely a peripheral concern of the [NLRA] . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act."  Farmer v. United Bhd. of Carpenters & Joiners of Am. Local 25, 430 U.S. 290, 296-297 (1977), quoting Garmon, supra at 243-244.

Thus, a two-part analysis applies: whether the underlying claim involves activity that is arguably subject to § 7 and § 8 of the NLRA, and if so, whether that claim nevertheless falls within the "peripheral concern" or the "local interests" exceptions to Garmon preemption. Farmer, 430 U.S. at 296. We agree with the union insofar as it argues that the discrimination that the commission alleged the union engaged in while operating its shape ups at the dock is "arguably prohibited by §§ 8(b)(1) and 8(b)(2) of the NLRA" and therefore potentially fits within the sweep of Garmon preemption. Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 196 (1978). See Farmer, supra at 303 n.11 ("Discrimination in hiring hall referrals constitutes an unfair labor practice under §§ 8[b][1][A] and 8[b][2] of the NLRA"). This conclusion is reinforced by the fact that the NLRB assumed jurisdiction over a complaint based on essentially the same claims that one of Robar's coworkers filed.

The second step in the analysis is controlled by Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination, 375 Mass. 160, 174 (1978). There, the Supreme Judicial Court held that "State antidiscrimination statutes are not preempted by Federal labor law [including the NLRA]." Id. The court reasoned that discrimination falls within the "peripheral concern" exception to Garmon preemption. Id.

Despite the age of this case, it remains good precedent binding on us. See Driscoll v. Carpenter's Council of W. Pa., 525 Pa. 205, 213 (1990) (State discrimination claim against union not barred even though NLRB could have pursued matter as unfair labor practice pursuant to NLRA). Thus, while it is not too late for the union to argue that Garmon preemption bars the commission's case, we hold that it does not.

In its amicus brief, the Massachusetts AFL-CIO (AFL-CIO) argues that the type of discrimination alleged here perhaps best can be characterized as a violation of the union's "duty of fair representation," a doctrine that imposes on unions the obligation to fairly represent all employees, whether members of the union or not, "without hostility or discrimination toward any." Vaca v. Sipes, 386 U.S. 171, 177 (1967). Because the NLRB plainly has authority to enforce the duty of fair representation pursuant to § 9 of the NLRA, 29 U.S.C. § 159, the AFL-CIO argues that the commission's claims here may be preempted even apart from Garmon preemption, which is based on §§ 7 and 8 of the NLRA. We are unpersuaded that this helps the union here. Neither the union nor the AFL-CIO has provided a convincing reason why any preemption implicated by the duty of fair representation should be viewed as broader than Garmon preemption. To the contrary, the cases establish that in light of the history of the duty of fair representation -- which first

arose as a judicially created construct -- the NLRB's authority to enforce that duty has never been viewed as exclusive. See Leahy v. Local 1526, Am. Fed'n of State, County, & Municipal Employees, 399 Mass. 341, 346-347 (1987), citing Vaca, supra at 186. Relatedly, it follows that a claim of preemption based on the NLRB's authority to enforce the duty of fair representation -- unlike Garmon preemption -- can be waived. Accordingly, to the extent that the union seeks to argue that the commission's case is preempted based on a form of preemption that extends beyond Garmon preemption, such arguments have been waived.

Amended final judgments affirmed.